**STATE OF ALABAMA ex rel. William J. BAXLEY, Attorney General, et al., Petitioners,**

v.

**ENVIRONMENTAL PROTECTION AGENCY and Russell E. Train, Administrator, Respondents.**

**Nos. 75–4435, 76–1056 and 76–3604.**

United States Court of Appeals, Fifth Circuit.

Aug. 18, 1977.

Henry H. Caddell, David E. Dunn, Asst. Attys. Gen., Montgomery, Ala., Don B. Long, Jr., John D. Quenelle, Birmingham, Ala., for petitioner in Nos. 75–4435 and 76–1056.

MacBeth Wagnon, Jr., Birmingham, Ala., H. Gerald Reynolds, Tampa, Fla., and William T. Steen, New Orleans, La., for intervenor in Nos. 75–4435 and 76–1056 and petitioner in 76–3604, U. S. Pipe & Foundry Co.

Russell E. Train, Administrator, EPA, Peter R. Taft, Asst. Atty. Gen., Dept. of Justice, Edmund B. Clark, Alfred T. Ghiorzi and Patrick Mulloy, Attys., Pollution Control Section, Washington, D. C., for respondents.

Albert J. Slap, Public Interest Law Center of Philadelphia, Philadelphia, Pa., amicus curiae.

Before MORGAN and HILL, Circuit Judges, and NOEL,* District Judge.

JAMES C. HILL, Circuit Judge:

This case involves two petitions seeking judicial review of certain administrative permits and orders issued by the Environmental Protection Agency ("EPA"), under the Federal Water Pollution Control Act ("FWPCA"). The first petition, filed by the State of Alabama in late 1975, was followed by a petition on behalf of the Alabama Conservancy and several other environmental organizations including the Birmingham Audubon Society and the Sierra Club. This controversy began in November, 1973, when EPA proposed to issue a National Pollutant Discharge Elimination System ("NPDES") permit to the North Birmingham facility of the U. S. Pipe and Foundry Company ("U. S. Pipe").[1]

The limitations proposed by the EPA for the permit were virtually identical to those contained in an earlier Consent Decree which had resolved a 1971 suit brought by EPA against the same U. S. Pipe facility under the Rivers and Harbors Act of 1899, 33 U.S.C. § 407 (the "Refuse Act").[2] The Consent Decree had been negotiated after the passage in 1972 of the Federal Water Pollution Control Act Amendments ("FWPCAA"), which restructured the whole federal program for water pollution control.

The basic approach of the FWPCAA was to make unlawful all discharges of pollu-

---

* Senior District Judge of the Southern District of Texas, sitting by designation.

1. Waste water from various U. S. Pipe facilities is discharged into Five Mile Creek, a small tributary of the Black Warrior River. The combined effluent of U. S. Pipe includes suspended solids, BOD, COD, oil and grease, ammonia, phenols, cyanide, dissolved solids, fluoride, iron, lead, manganese, copper, chromium, and other metals.

2. Prior to 1970, Section 13 of the Refuse Act had been used principally for the licensing or permitting of structures built in the navigable rivers of the United States. In 1970, however, the Department of Justice initiated actions against certain industrial dischargers who had discharged pollutants into navigable waters or their tributaries without permission from the Secretary of the Army. On December 30, 1970, President Nixon issued Executive Order No.

11574 directing the Army Corps of Engineers to institute a regulatory program for the issuance of permits under the Refuse Act. Regulations were promulgated to implement the program, see 38 Fed.Reg. 6564, and the United States subsequently brought an enforcement action against U. S. Pipe and other industrial discharges. Ultimately, litigation over the Refuse Act permit program suspended the entire program. In order to expedite the process and develop a permit for U. S. Pipe, the EPA and the Department of Justice entered into negotiations with U. S. Pipe in an effort to settle the litigation. After 11 months of negotiations, the parties agreed to the Consent Decree which was issued by Judge Pointer on January 5, 1973. Initial Decision of Administrator, A. 104, 105–107 (references to the Appendix will be designated "A" and followed by the appropriate page number).

tants into the waters of the United States unless the discharge was made in compliance with conditions contained in a permit issued under Section 402 of the Act. This approach was a significant departure from 1965 legislation which had established water quality standards without simultaneously limiting discharges made by particular point sources. Under the prior legislative scheme, there was always difficulty in proving that a particular discharger of pollutants had caused a violation of water quality standards.

Limitations on discharges were to be achieved in two stages under the 1972 legislation. The FWPCAA provided that all permits should incorporate effluent limitations based upon the use of "Best Practicable Control Technology" ("BPT") by July 1, 1977, and, "Best Available Control Technology" ("BAT"), by July 1, 1983.[3]

In October, 1972, EPA published a document known as the Preliminary Guidance Document for the Iron and Steel Industry, which suggested the types of treatment and the numerical limitations which would constitute BPT for certain processes in the iron and steel industry. Although two of the five industrial processes of the U. S. Pipe facility were covered by the Guidance Document—coke ovens and blast furnaces—three of the processes were not covered, namely cast iron pipe, mineral wool insulation, and aromatic organic chemicals.

In light of the 1972 FWPCAA, the EPA and U. S. Pipe resolved the Refuse Act

litigation by negotiating the above-mentioned Consent Decree to establish effluent limitations which they felt would be equivalent to the BPT required to be achieved by July 1, 1977, in all NPDES permits. In doing so, the parties relied heavily upon the Guidance Document for information defining BPT for coke and blast furnace operations and relied upon their own experience, common knowledge, and judgment in setting effluent limitations for the other three processes. EPA experts later testified that the limitations actually established in the Consent Decree represented BPT for the facility.

Recognizing that U. S. Pipe would have to apply for an NPDES permit under the FWPCAA, the parties agreed to and set forth in the Consent Decree the following provision:

Subsequent to the entry of this Decree, a Federal permit will be issued to the company pursuant to the Federal Water Pollution Control Act Amendments of 1972, which permit will, to the fullest extent possible, in view of the requirements of Section 401 (certification) and Section 402(a)(1) (opportunity for public hearing) of the Act, be consistent with the applicable provisions of this decree.

In November, 1973, EPA issued a public notice of proposed permit issuance and a fact sheet concerning U. S. Pipe's NPDES permit. In response, the State of Alabama and a number of environmental groups requested a public hearing to determine if the

---

**3.** 33 U.S.C. § 1311 provides in pertinent part:

\* \* \* \* \* \*

(b) In order to carry out the objective of this chapter there shall be achieved—

(1)(A) not later than July 1, 1977, effluent limitations for point sources, other than publicly owned treatment works, (i) which shall require the application of the *best practicable control technology currently available* as defined by the Administrator pursuant to section 1314(b) of this title, or (ii) in the case of a discharge into a publicly owned treatment works which meets the requirements of subparagraph (B) of this paragraph, which shall require compliance with any applicable pretreatment requirements and any requirements under section 1317 of this title . . . . . (emphasis supplied)

\* \* \* \* \* \*

(2)(A) not later than July 1, 1983, effluent limitations for categories and classes of point sources, other than publicly owned treatment works, which (i) shall require application of the *best available technology economically achievable for such category or class*, which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants . . . . (emphasis supplied).

The permits issued pursuant to these sections are usually referred to respectively as permits which are "technology limited" or "water quality limited."

proposed permit for U. S. Pipe was consistent with the FWPCAA. Such a hearing was held in Birmingham, Alabama in February, 1974, and participants included representatives of the State, environmental groups and U. S. Pipe.

At the time the Consent Decree was negotiated, the state water quality standard for Five Mile Creek was "Treated Waste Transportation." On September 17, 1973, before the U. S. Pipe permit was issued, the Alabama Water Improvement Commission ("AWIC"), changed the use classification for Five Mile Creek to a category denominated as "Fish and Wildlife as a Goal."

EPA issued its permit to U. S. Pipe on April 8, 1974, requiring that the BPT effluent limitations, as taken from the Consent Decree, be met during the period September 1, 1975, through July 1, 1977. The permit also included a new requirement, incorporated in response to comments made at the public hearing, of more stringent limitations necessary to achieve, by July 1, 1979, a Fish and Wildlife water quality standard in Five Mile Creek. Following the issuance of the permit, two requests for an adjudicatory hearing were filed. The office of the Attorney General filed the first request on behalf of the State of Alabama, and the Alabama Conservancy, Alabama Wildlife Federation, the Bass Angler Sportsmen's Society and five other organizations filed the second request. EPA issued public notice that it intended to hold public hearings and, at the same time, announced that there existed a thirty day period during which persons could request to become parties to the proceeding. U. S. Pipe filed such a request which was granted. Subsequently, three other public interest and environmental organizations became parties to the hearing.[4] The AWIC, however, did not elect to become a party to the proceedings.

EPA assigned the hearing to an Administrative Law Judge ("ALJ"), who ordered a prehearing conference to identify disputed issues of fact and law, to establish a schedule for submission of written testimony and to consider other matters pertaining to the conduct of the hearing. In the interim period between receipt of requests for hearing and the date of the prehearing conference, EPA amended its procedural regulations governing adjudicatory hearings. See 40 C.F.R. 125.36(m). Pursuant to these procedures, the ALJ was required to identify issues of law and refer them to the Assistant Administrator for Enforcement and General Counsel for resolution. The decision on these legal issues would, in turn, be incorporated into the agency's initial decision.

Accordingly, two issues pertinent to this appeal were referred to the Assistant Administrator for Enforcement and General Counsel for resolution:

1. Does a Consent Decree entered into between U. S. Pipe and Foundry Company and the Department of Justice, acting on behalf of the Environmental Protection Agency, bind the Agency in its consideration of the appropriate limitations, conditions, and terms to be imposed in the permit to be issued to the Company?

2. Does Section 301(b)(1)(C) of the Act require the achievement of effluent limitations more stringent than "best practicable control technology" if such limitations are necessary to implement water quality standards established pursuant to the Act?

   A. 110.

The EPA General Counsel responded to the first question essentially in the affirmative. He indicated, however, that although the agency was required to *propose* conditions consistent with the consent decree, such conditions should not be adopted "unless an agency assessment of comments received pursuant to Section 401 [concerning certification by the states] and Section 402(a)(1) [concerning opportunity for public hearing] concludes that conditions inconsistent with

---

**4.** The State of Alabama, the Alabama Conservancy and the other environmental organiza-

tions will hereinafter be collectively referred to as "the State."

the decree should be imposed." [5] With regard to the second question, the General Counsel held that permits must include limitations more stringent than BPT if such limitations are necessary to meet water quality standards.

Following the Decision of the General Counsel, the adjudicatory hearing was held in Birmingham in December of 1974. After the compilation of an extensive record consisting of the testimony of fifteen witnesses, eleven hundred and seventy-four pages of transcript, and thirty-one exhibits, the Regional Administrator issued an Initial Decision upholding the permit in its entirety. The Decision concluded that the BPT limits of the Consent Decree and the permit were reasonable and represented the best evidence of effluent limitations which could be achieved by the use of BPT. [6] With respect to the limitations to be achieved by 1979, the Regional Administrator concluded that such limitations were "as consistent with Fish and Wildlife criteria as any person with scientific background and expertise in the field was willing to suggest."

The State appealed the Regional Administrator's original decision to the Administrator pursuant to EPA regulations. The Administrator upheld the Initial Decision, and in doing so, made two significant findings which are now at issue in this litigation. [7] First he held that the appropriate water quality standards and effluent limitations were those which were in effect at the time of the initial permit issuance. Second, he held that Section 301(b)(1)(C) provided discretion for the Administrator to allow a discharger beyond July 1, 1977, to achieve effluent limitations required to meet water quality standards as long as steps had been taken *to implement* such standards by July 1, 1977.

The Administrator subsequently modified his Decision upholding the Regional Administrator on two occasions. On December 9, 1975, he modified it to hold that the applicable water quality standard for the permit issued to U. S. Pipe was "Fish and Wildlife as a Goal" as originally submitted by the State and approved by EPA in January, 1974, rather than the standard as subsequently amended by the AWIC on April 19, 1974. A. 187–88. This modification indicated the Administrator's express disapproval of the amendments made by the AWIC to the standard as originally announced.

On December 15, 1975, the State petitioned this Court for review of the Administrator's decision, as modified.

On June 24, 1976, the Administrator issued a second modification of his decision. He therein held that his prior reliance upon the distinction between water quality standards which must be "met" by July 1, 1977, and those which must be merely "imple-

---

**5.** The Decision also stated as follows:

If during any of the proceedings provided for under the NPDES regulations, 40 C.F.R. § 125, a condition in the proposed permit is challenged by an interested person or member of the public, other than the Agency or the discharger, the arguments must be afforded as much consideration in the determination of the condition as would be afforded in any permit proceeding where no consent decree had been agreed to by the Agency and the discharger. A. 149.

**6.** The Regional Administrator's Decision stated:

Based on the record as a whole, one must conclude that the limitations contained in the permit do in fact reflect the application of BPT as determined by the Administrator, which in the absence of published guidelines must be determined by him through the use of good engineering judgment, experience, and exami-

nation of what other facilities of like nature have been able to accomplish in the way of waste water treatment control. A. 131.

**7.** The Administrator accepted for review the following issues:

(1) Are the appropriate water quality standards and effluent limitations to be applied, those which were in effect at the time of the initial permit issuance, or those which were promulgated after the permit was issued, but prior to final action following the adjudicatory hearing?

(2) Does Section 301(b)(1)(C) of the Act require that permit limitations be established such that the permittee is required to *meet* water quality standards promulgated pursuant to Section 303 of the Act by 1977, or only that such limitations *implement* water quality standards promulgated pursuant to Section 303 by 1977? *Decision of the Administrator,* A. 175.

mented" by July 1, 1977, was misplaced. He therefore concluded that all limitations based on any water quality standards must be fully achieved by July 1, 1977, and he directed the Regional Administrator to modify U. S. Pipe's permit to specify such a deadline where appropriate. In furtherance of this mandate, the Regional Administrator issued a modified permit to U. S. Pipe on July 2, 1976.

## I. *The Validity of the BPT Limitations Contained in the Permit.*

Although the Consent Decree resolved pending litigation initiated under the Refuse Act, it was negotiated in anticipation of the requirements of the FWPCAA. Provision XIV of the Decree contemplated that the Decree would not relieve U.S. Pipe of its obligation to obtain a permit following adoption of the Decree:

XIV. This decree is not and shall not be interpreted to be a permit for discharge of matter into navigable waters or their tributaries which may be required by federal or state law, nor shall it in any way affect the company's obligation to secure any such permit. Subsequent to the entry of this decree, a Federal permit will be issued to the company pursuant to the Federal Water Pollution Control Act Amendments of 1972, which permit will, to the fullest extent possible, in view of the requirements of Section 401 (certification) and Section 402(a)(1) (opportunity for public hearing) of the Act, be consistent with the applicable provisions of this decree. *United States v. U. S. Pipe & Foundry*, CA. No. 71–536–S, N.D. Ala. (1973).

By stating that the permit would be consistent with the applicable provisions of the Decree only "to the fullest extent possible, in view of the requirements of Section 401 (certification) and Section 402(a)(1) (opportunity for public hearing) of the Act," the

parties indicated their understanding that the Decree would not be entirely binding in the permit proceeding. EPA's General Counsel later confirmed the approach expressed by the parties in the Decree. In his response to questions certified by the ALJ, he concluded that the terms of the Decree were binding unless the state certification procedure or[8] the public hearing demonstrated the need for other conditions.

It is also apparent from the record that EPA did not consider itself absolutely bound by the terms of the Decree. The agency issued public notice and a fact sheet concerning the proposed permit. Representatives of the State, various environmental organizations and U.S. Pipe participated in the ensuing public hearing. After consideration of the comments, EPA issued the permit to U.S. Pipe, requiring the company to meet the BPT effluent limitations, as established in the Consent Decree, during the period September 1, 1975, through July 1, 1977. Moreover, in response to testimony given at the public hearing, the permit went beyond the terms of the Consent Decree to require more stringent limitations necessary to meet a fish and wildlife water quality standard in Five Mile Creek as required by Section 301(b)(1)(C) of the Act. The permit required the Company to achieve these additional limitations by July 1, 1979.[9]

Despite this background, the State argues that EPA, by incorporating the effluent limitations of the Consent Decree into the permit, has violated the public hearing requirement of section 402(a)(1). Since no changes were made in the discharge limitations set for the period December 1, 1975, through July 1, 1977, they urge that the numerous objections from members of the public, including the State of Alabama and other petitioning organizations, were ignored by EPA. The State argues further that EPA should have incorporated into the

---

8. The State of Alabama waived its right of certification with respect to the U.S. Pipe permit.

9. This deadline was later changed to July 1, 1977, in order to comport with the Administra-

tor's determination that the FWPCA required U.S. Pipe to meet, rather than merely to implement, water quality standards more stringent than BPT.

permit the limitations set forth in the Preliminary Guidance Document ("Guidance") for the Iron and Steel Industry. Although the regulations were promulgated after the initial issuance of the permit, and after the request for and determination to hold an adjudicatory hearing, the State argues that the Guidance limitations were the best indication of BPT for the U.S. Pipe facility. Since the permit did not become final for purposes of judicial review until the Administrator had acted on the appeal, they argue that EPA was obligated to amend the permit upon issuance of the proposed regulations. This same argument has been rejected by the Administrator, whose Decision stated:

> As a matter of general policy in the administration of a nationwide permit system, I agree with the arguments put forward by EPA staff counsel and U.S. Pipe that to allow permit limitations and conditions to change according to a "floating" standard or guideline during the pendency of a permit review proceeding would be highly disruptive and counter-productive. The Act clearly contemplates that NPDES permits will be issued "prior to the taking of necessary implementing actions" relating to requirements under 301, 302, and other sections of the Act. In such instances, the Act provides that permit conditions will be determined by the Administrator "as necessary to carry out the provisions of this Act." I recognize that permit review proceedings may consume many months, during which standards and guidelines for determining permit conditions may change (or take on greater specificity). These changes may mean that if the permit was being initially issued today, the conditions might be either more lenient or more stringent. It is not a one-way street.

> \*    \*    \*    \*    \*    \*

> The Administrator's review [of the Regional Administrator's action] must be based on the record of the proceedings. Although matters contested in an adjudicatory hearing do not become *final* for purposes of judicial review until the Administrator has acted on an appeal, the Administrator's review of the original action taken by the Regional Administrator should be based on the standards and guidelines in existence at the time the original action was taken, and thus, to that extent, finality must be accorded the original action taken. To conclude otherwise would mean that the Administrator would become the sole and final arbitrator of every permit limitation where a party (EPA included) might want to gamble on the likelihood of an intervening change in the applicable standards or guidelines. Such a result would be inimical in the extreme to the nation's water pollution control program. As a matter of policy, EPA should do its utmost to avoid problems associated with the "moving target" criticism so often asserted by those subject to the regulatory requirements of this and other government agencies. The standards and guidelines for the preparation of NPDES permits must be fixed at some point in time so permit terms can become final and pollution abatement can proceed. I believe the proper point in time for fixing applicable NPDES standards and guidelines is when the Regional Administrator initially issues a final permit. *Decision of the Administrator*, A. 178–79.

The FWPCA requires that all NPDES permits contain limitations necessary to assure application of BPT by July 1, 1977. Section 301(b)(1)(A). When such regulations are promulgated by the Administrator, they become the basis for permit conditions for facilities within the class or category. Prior to promulgation of such regulations, the Administrator is authorized to include conditions which he determines are necessary to carry out the provisions of the Act:

> Except as provided in . . ., the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants . . . upon condition that such discharge will meet either all applicable requirements under sections

301, 302, 306, 307, 308 and 403 of the Act *or prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this Act.* Section 402(a)(1) (emphasis added).

In order to determine whether the limitations contained in the permit were in compliance with the BPT requirements of the Act, therefore, the ALJ did not have the benefit of final regulations for the Iron & Steel industry. Nonetheless, he placed considerable weight on a comparison of the limitations contained in the Guidance Document and those specified in the Consent Decree.[10] He determined that in some instances the Consent Decree parameters were more stringent than the Guidance Document and in some instances less stringent. *Initial Decision*, A. 126. He also noted that the Guidance Document specified no limits whatsoever for many of the parameters covered by the Consent Decree and that, according to one of EPA's witnesses, the permit might well have included none of the limits for these parameters in the absence of the Decree.[11]

SOME COMPARISONS
U. S. PIPE & FOUNDRY CO.

Lb/Day Limits for July 1, 1977 Compared

| Parameter | | Permit Limit | Consent Decree | Guidance * |
|---|---|---|---|---|
| Ammonia (as N) | Daily Max. | 941 | 941 | 2823 |
| Ammonia (as N) | 30-day Avg. | 941 | 941 | 941 |
| Cyanide | Daily Max. | 20 | 20 | 85.8 |
| Cyanide | 30-day Avg. | 20 | 20 | 28.6 |
| Phenol | Daily Max. | 8 | 8 | 24.3 |
| Phenol | 30-day Avg. | 8 | 8 | 8.1 |
| TSS | Daily Max. | 4,000 | 4,000 | 390 |
| TSS | 30-day Avg. | 2,160 | 2,160 | 130 |
| Oil & Grease | Daily Max. | 1,230 | 1,230 | 1851 |
| Oil & Grease | 30-day Avg. | 615 | 615 | 617 |
| pH | Range | 6–8.5 | 6–8.5 | 6–9 |
| BOD$_5$ | Max./Avg. | 3,300/2,200 | 3,300/2,200 | No Limits |
| COD | Max./Avg. | 14,625/9,750 | 14,625/9,750 | No Limits |
| TDS | Max./Avg. | 80,000/65,500 | 80,000/65,500 | No Limits |
| Fluoride | Max./Avg. | 330/220 | 330/220 | No Limits |
| Aluminum | Max./Avg. | 1,500/750 | 1,500/750 | No Limits |
| Arsenic | Max./Avg. | 6.2/3.1 | 6.2/3.1 | No Limits |
| Cadmium | Max./Avg. | 2.0/0.8 | 2.0/0.8 | No Limits |
| Chromium T | Max./Avg. | 34/17 | 34/17 | No Limits |
| Chromium + 6 | Max./Avg. | 6.2/3.1 | 6.2/3.1 | No Limits |
| Copper | Max./Avg. | 60/30 | 60/30 | No Limits |
| Iron | Max./Avg. | 370/185 | 370/185 | No Limits |
| Lead | Max./Avg. | 35/25 | 35/25 | No Limits |
| Manganese | Max./Avg. | 150/100 | 150/100 | No Limits |
| Mercury | Max./Avg. | 0.1/0.1 | 0.1/0.1 | No Limits |
| Tin | Max./Avg. | 620/310 | 620/310 | No Limits |
| Zinc | Max./Avg. | 120/60 | 120/60 | No Limits |

\* These limits are for the coke biproduct process (including organic chemical) plus the blast furnace process. It does not include any allowance for the cast iron pipe process or the mineral wool process.

---

**10.** The ALJ referred to the following table, which was set forth as Exhibit No. 4 in the record before him:

**11.** The ALJ quoted with approval the statement in the Decision of the Assistant Administrator for Enforcement and General Counsel that: [t]he terms of the Decree entered in the Refuse Act proceeding were based on the parties' understanding of the best technical information available at that time. The Agency entered into the agreement to encourage prompt construction of abatement

The ALJ, on behalf of the Regional Administrator, also reviewed the testimony of expert witnesses familiar with U.S. Pipe's facilities. The testimony had indicated that the North Birmingham complex consisted of five major manufacturing facilities: a by-product coke plant, a chemical plant, a blast furnace plant, a mineral wool plant and a cast iron pipe plant. Of these, only the coke and blast furnace operations were covered by the Guidance Document. In his decision, the ALJ took into consideration the Guidance Document, where applicable, as well as the testimony of expert witnesses and, based on his review, upheld the numerical limitations in the permit as taken from the Consent Decree. The Administrator again reviewed the record and affirmed the ALJ's Decision.

■ We affirm EPA's conclusion that the appropriate BPT limitations to be applied in a permit are those in effect at the time of initial permit issuance. Permit review proceedings may consume many months during which standards and guidelines might change more than once. Until proposed regulations withstand the rigors of the full administrative process, they are too tentative to govern the actions of regulated companies. Moreover, ongoing proceedings should not be interrupted when proposed regulations become final. A contrary rule would create havoc in EPA's permit development procedures. Thus, it was entirely appropriate for EPA to rely principally upon its own "personalized" BPT, as established in the Consent Decree, for the U.S. Pipe facility.

■ We conclude further that U.S. Pipe's permit was issued in full compliance with the public participation requirement of section 402(a)(1). Notice was given and a full public hearing was conducted. It was neither arbitrary nor capricious for EPA to *propose* for the U.S. Pipe permit the limitations previously established in the Consent Decree. Although the litigation resolved by the Decree was initiated under the Refuse Act, the Decree was entered more than two months after the effective date of the 1972 Amendments to the FWPCA. The analysis, evaluation, and negotiation which culminated in the Decree was based on the knowledge that section 301(b)(1)(A) of the Act required the development of effluent limitations consistent with the achievement of BPT by July 1, 1977. The right of the public to participate in the permit proceeding was not diminished simply because EPA proposed for the permit the limitations established in the Decree.

■ The State argues that the public participation which occurred in the permit proceeding was rendered meaningless because EPA, over strenuous objection from several parties, incorporated into the permit exactly the same limitations contained in the Decree. We disagree. The right of public participation under section 402(a)(1) does not guarantee that a particular result will flow from the administrative process. In deciding on the permit limitations, EPA considered an extensive administrative record, as well as the exhaustive analysis which culminated in the Consent Decree. The agency was required to choose between competing interest and to weigh the testimony of expert witnesses whose conclusions were in conflict. In the exercise of its discretion, the agency decided that the effluent limitations of the Decree were also appropriate for the period specified in the permit. That decision was well within EPA's authority.

The State relies on *United States v. Rohm & Haas*, 500 F.2d 167 (5th Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1352, 43 L.Ed.2d 439 (1975), for the proposition that a consent decree resolving Refuse Act litigation cannot be deemed binding in the determination of effluent limitations under the 1972 amendments. In *Rohm & Haas,*

facilities rather than delay an abatement schedule until development of effluent limitations guidelines. The Government assumed the risk that more stringent limitations than those imposed in the Decree might be applicable to the Company under the Federal Water Pollution Control Act, while the Company chanced that less stringent standards might apply in the future. A. 126.

the district court had entered an injunction, prior to adoption of the 1972 FWPCAA, requiring the company to implement comprehensive effluent limitations. On appeal *Rohm & Haas* sought dissolution of the injunction during the period in which EPA was considering the issuance of an NPDES permit to the company. This court held that the Refuse Act injunction was valid and properly issued, but stressed that it could have no effect beyond the date on which *Rohm & Haas* was issued an NPDES permit:

> Because the issue is what an equity court should do pending EPA action, however, the District Court's order must be modified so as not to govern the Company's conduct after a permit had been issued. A polluter discharging wastes in accordance with the terms and conditions of an NPDES permit is not in violation of the Refuse Act. See FWPCAA § 402(a)(4), 33 U.S.C.A. § 1342(a)(4) (Supp.1974). The decree should be effective only as long as Rohm and Haas remains in violation of the Act. In contrast to the regulations implementing the earlier U.S. Army Corps of Engineers Refuse Act Permit Program, *the EPA rules governing the National Pollution Discharge Elimination System do not require that the permit include limitations embodied in the resolution of a civil action under the Refuse Act.* Compare 33 C.F.R. § 209.131(d)(4) (1973) *with* 40 C.F.R. §§ 125.11, 21–.24, .42 (1973). (emphasis supplied) 500 F.2d at 175.

> \* \* \* \* \* \*

In any event, the effect of the District Court's decree will not survive the issuance of a permit, which will depend upon the application of FWPCAA standards to Rohm and Haas equally with all other applicants. 500 F.2d at 178.

*Rohm & Haas* is instructive, but in light of several distinguishing factors in this appeal, it is not dispositive of the issues here under consideration. First, EPA did not treat the Consent Decree, as carried out by EPA's Region IV, as completely binding.

The Decision of EPA'S General Counsel provided that the Decree was binding only to the extent consistent with the agency's responsibilities under sections 401 and 402(a)(1) of the Act. Since the State waived its right of certification, and adequate public participation was afforded, the Consent Decree merely served as the starting point of the permit proceedings.

Second, unlike the court-ordered limitations of the *Rohm & Haas* injunction, the effluent limitations contained in the U.S. Pipe Consent Decree were negotiated with the intention of complying with the 1972 Amendments. Third, the U.S. Pipe limitations were given an administrative imprimatur of validity, whereas the *Rohm & Haas* limitations were judicially imposed, as a temporary measure, pending the type of administrative proceeding which has occurred here.

## II. *The Water Quality Standard Applicable to the U.S. Pipe Facility.*

U.S. Pipe argues that the Alabama water quality standard of Fish and Wildlife as a Goal is applicable to its permit, and that the standard required only BPT by July 1, 1977. Although Alabama nominally adopted its standard before U.S. Pipe's permit was issued, the standard was not defined until April 19, 1974, eleven days after the permit was issued. Following the publication of the Alabama definition, EPA notified the State that the classification was not consistent with its policy on the requirements of the FWPCA. When the State failed to amend its classification, EPA established the Fish and Wildlife standard for all streams in Alabama to which the Alabama standard of Fish and Wildlife as a Goal had applied. It is EPA's contention that this federal standard is applicable to the U.S. Pipe permit.

EPA's invalidation of the State standard and its promulgation of a federal standard, however, have been declared invalid. *Associated Industries of Alabama v. Train,* No.

75–M–0092 (N.D.Ala. Dec. 7, 1976).[12] Thus, the only water quality standard which might be applicable to the U.S. Pipe facility is the state standard of Fish and Wildlife as a Goal. EPA contends, however, that the agency granted its approval of the State standard only because EPA understood, in the absence of definitions provided by the State, that the standard required achievement of water quality criteria normally associated with a Fish and Wildlife standard.[13] Hence, the agency contends that the Fish and Wildlife as a Goal standard is equivalent to the Fish and Wildlife standard despite the State's definition to the contrary. U.S. Pipe, on the other hand, argues that the State's definition of its own standard should apply, even though that definition was issued on April 30, 1974, eleven days after the permit was issued.

These arguments place the court in a dilemma which cannot be resolved by resort to the language of the FWPCA. If EPA's "understanding" of the standard is said to be controlling, the federal standard declared invalid in *Associated Industries* will be resurrected. If that were to occur, EPA would have accomplished by means of an unexpressed "understanding" that which it failed to accomplish using the administrative process.

If the belated definition of the State is said to be applicable, the operative State standard will be no more stringent than BPT. Such a state of affairs will to some extent frustrate the second, *i. e.,* water quality standard, level of regulation under the FWPCA. The anomaly of Alabama's regulatory scheme lies in its decision to define the water quality standard Fish and Wildlife as a Goal in terms of the criteria applicable to the technology standard BPT. EPA noted the inconsistency of this regulatory scheme when it attempted to override the State standard:

> The "Goal" classification did not contain specific water quality criteria. *The criteria for the "Goal" classification consisted of section 301 of the Act* (Best Practicable Technology by 1977, Best Available Technology by 1983). The Act distinguishes between these technology limitations, applicable to particular sources of pollution, and water quality

---

**12.** In *Associated Industries* Judge McFadden denied a motion by the Attorney General of the State of Alabama to intervene in behalf of EPA defendants. On December 13, 1976, a panel of this court held that the motion to intervene was properly denied, where the positions of EPA and Alabama were identical and no aspect of the case would be illuminated by Alabama's presence in the suit. *Associated Industries of Alabama, Inc. v. Train,* 543 F.2d 1159 (5th Cir. 1976). An appeal on the merits of Judge McFadden's decision was dismissed by stipulation of the parties on April 11, 1977.

**13.** When EPA established the substitute minimum federal standard of Fish and Wildlife for all Alabama streams, it described the chronology of events surrounding the State standard as follows:

> Alabama, prior to October 17, 1972, adopted water quality standards for both interstate and intrastate waters. After the enactment of the 1972 amendments, the U.S. Environmental Protection Agency reviewed both interstate and intrastate standards pursuant to section 303 of the Act. On January 18, 1973, the Regional Administrator notified Alabama that certain revisions to its interstate water quality standards were necessary to make

the standards consistent with applicable requirements of the Act and *that all waters should be reclassified to, at minimum, Fish and Wildlife unless adequate justification for exceptions to the Fish and Wildlife criteria, on a case-by-case basis, could be provided to the EPA. . . .* On September 17, 1973, new and revised water quality standards for interstate and intrastate waters which reclassified all waters of the State to a minimum of Fish and Wildlife, were adopted by the State and submitted to the EPA on November 26, 1973. The EPA approved the Alabama standards on January 29, 1974.

> *On April 19, 1974, Alabama published its standards and adopted an amendment to the standards which explicitly established and defined the classification of Fish and Wildlife as a "Goal" for certain waters of the State.* This additional revision was not reflected in the EPA's prior approval of January 29, 1974, noted above.

> \* \* \* \* \* \*

> *EPA notified the State on April 30, 1974, that the "Goal" classification was not consistent with EPA policy or the requirements of the Act.* 39 Fed.Reg. at 41254, 41255 (emphasis added).

standards, which define desirable ambient water quality. The section 301 requires establishment of minimum levels of treatment based on consideration of available technology and other factors enumerated in sections 301 and 304 of the Act. Under section 301(b)(1)(C), additional treatment may be required to meet ambient water quality standards, which are to be established in accordance with the factors set out in section 303. Adopting these technology definitions as the water quality standards is therefore inconsistent with the statutory scheme. 39 *Fed. Reg.* 41254, 41255 (emphasis added).

■ EPA's criticisms are valid, but if the agency had required the State to specify the criteria applicable to its standard as a condition for granting approval, the uncertainty surrounding the State's water quality standards could have been avoided. Having chosen not to interject such a requirement into its approval process, EPA cannot accomplish its ends by obtaining a declaration from this court that its unexpressed "understanding" should be preferred to the State's definition of a state standard. In the absence of a superseding federal standard lawfully issued by EPA, we therefore find that the State standard Fish and Wildlife as a Goal, as defined by the AWIC, is the applicable standard until altered by the State itself.[14]

■ In summary, the Decision of the Administrator is enforced to the extent that it upholds the BPT limitations of the U.S. Pipe permit. In the absence of a more stringent water quality standard, and until the State adopts a different standard, the Alabama standard of Fish and Wildlife as a Goal is the only state standard applicable to Five Mile Creek. Due to the peculiar circumstances of this case, therefore, the State of Alabama has not triggered the operation of section 301(b)(1)(C), which requires achievement by July 1, 1977, of effluent limitations more stringent than BPT if such limitations are necessary to implement water quality standards "adopted pursuant

to any State law or regulation." Thus, enforcement of the Administrator's Decision is denied to the extent that it required modification of the permit to achieve water quality standards more stringent than BPT.

ENFORCED in part, VACATED in part.

14. On June 24, 1976, the Administrator modified his previous decision to require achievement of water quality standards by July 1,

1977. In this modification, the Administrator noted:

Upon review of all of the pleadings now before me, I am convinced that my prior reliance on whatever difference in connotation there may be between "meet" and "implement" was misplaced. Upon consideration of the clear and convincing legislative history and upon further reflection on the statutory language itself, I must conclude that section 301(b)(1)(C) demands that water quality standards, including those established pursuant to Section 303 of the 1972 Act amendments, be fully achieved not later than July 1, 1977. (*Second Modification to Decision of the Administrator*, A. 202).

As a result of this modification, EPA is now in agreement with the State's claim that section 301(b)(1)(C) requires that all limitations based on water quality standards be fully achieved by July 1, 1977. U.S. Pipe, however, has challenged petitioners' assertions on this point. The company urges this court to adopt the distinction between "meet" and "implement" since rejected by the Administrator. In view of our conclusion that the existing water quality standard applicable to Five Mile Creek does not impose any more stringent limitations than BPT, we find it unnecessary to decide whether this distinction is valid. In addition, we pretermit any decision as to the validity of the limitations included in the permit to meet water quality standards.